IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00255-TWT-RGV |
| DERRICK POWELL | |

## ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 6th day of September, 2012.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:11-cr-00255-TWT-RGV |
| DERRICK POWELL | |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Derrick Powell ("Powell") is one of nine defendants charged in a fifteen-count indictment with unlawfully obstructing, delaying, and interfering with commerce by taking personal property in the custody and control of couriers of certain armored car companies by means of actual and threatened force, violence, and fear of injury, and conspiring to do so, in violation of 18 U.S.C. §§ 1951 and 2, and with carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.[1]  See [Doc. 312].  Pending before the Court is Powell's motion to suppress statements.  [Doc. 387].  Following an evidentiary hearing on April 24, 2012, on Powell's motion to suppress,[2] Powell filed a post-

---

[1] Specifically, Powell is charged only in counts one through five of the indictment.  See [Doc. 312].

[2] See [Doc. 426] for a transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits during the hearing, which will be

hearing brief, [Doc. 440], to which the government responded, [Doc. 447], and the pending motion is ready for ruling. For the following reasons, it is **RECOMMENDED** that Powell's motions to suppress, [Doc. 387], be **DENIED**.

## I. STATEMENT OF FACTS

On January 12, 2012, Powell was released from the Fulton County jail where he had been detained on unrelated charges since approximately August of 2011. (Tr. at 5). Upon learning that Powell was being released from state custody and could be taken into federal custody, Special Agents Paul Szabo ("Agent Szabo") and Brett Fears ("Agent Fears"), of the Federal Bureau of Investigation ("FBI"), went to the county jail to pick him up.[3] (Tr. at 4-5). Agents Szabo and Fears met Powell at the county jail while he was in the process of being released and placed him under arrest for the charges at issue in this case.[4] (Tr. at 5-7, 18).

Agents Szabo and Fears then drove Powell from the Fulton County jail to the Atlanta Police Department ("APD"), a trip which took about twenty minutes, and

---

referred to as "(Gov. Ex. ___)."

[3] Agents Szabo and Fears were dressed in plain clothes and while Agent Szabo testified that they "would have had weapons," he testified that they would not have had those weapons at the time they made contact with Powell because they were not permitted to take them inside the jail. (Tr. at 5-6).

[4] Agent Szabo described Powell as "perfectly calm, even jovial" when he was first arrested. (Tr. at 7).

escorted Powell to a booking room.[5] (Tr. at 7-8). During the trip, Powell appeared coherent and the agents did not converse with him about the facts of the case, threaten or coerce him in any way, or make any promises to him. (Tr. at 6, 8, 18).

Once inside the booking room,[6] Powell and Agent Szabo sat down and Agent Szabo placed an FBI Advise of Rights Form on the table and asked Powell to read the form while Agent Szabo read it aloud. (Tr. at 9). Agent Szabo then read the form, including the waiver clause,[7] verbatim. (Tr. at 9-11). At no time did Powell ask any questions about what Agent Szabo was reading to him or make any statements indicating that he was having difficulty understanding anything Agent Szabo was reading. (Tr. at 10). Agent Szabo then asked Powell if he was willing to speak with the agents at that time, and Powell indicated that he was. (Tr. at 10-11).

---

[5] The booking room was about 15 feet by 15 feet in size. (Tr. at 20). It contained a fingerprint unit, which consisted of a computer and a fingerprint scanner. (Id.). The room also contained a table with various papers and Federal Offender DNA swab kits and a couple of chairs. (Id.). Agents Fears and Szabo were the only people present in the room during Powell's interview, and it was not taped. (Tr. at 9, 18).

[6] Agent Szabo testified that although he and Agent Fears would have entered the building with weapons, they locked them up in a secure area before booking and interviewing Powell. (Tr. at 9).

[7] The waiver clause stated: "I have read this statement of my rights and understand what my rights are. At this time I am willing to answer questions without a lawyer present." (Tr. at 10-11 & Gov. Ex. 1).

Powell then initialed each right read to him and signed the waiver clause. (Tr. at 10 & Gov. Ex. 1).

Agents Szabo and Fears then interviewed Powell for about an hour.[8] (Tr. at 13). During this time, Powell seemed coherent, and he did not appear to be under the influence of alcohol or drugs and was responsive to the questions asked of him. (Tr. at 12). Agents Szabo and Fears did not threaten or coerce Powell into speaking, and at no time did Powell indicate that he was having difficulty understanding what was taking place.[9] (Tr. at 12-13). Powell was not handcuffed during the interview, although he remained in leg irons. (Tr. at 20).

After the interview concluded, but while they were still in the booking room, Agent Szabo processed Powell on the pending federal charges. (Tr. at 13). During this process, Powell provided answers that were responsive to the questions asked and followed all instructions. (Tr. at 13-14). The booking process, in part, consisted of Powell providing his name, address, and contact information. (Tr. at 14). The agents also took Powell's fingerprints, photographed any tattoos, and conducted a

---

[8] During this interview, Agent Szabo indicated to Powell that he had DNA evidence confirming his involvement with some of the robberies. (Tr. at 15).

[9] Powell only asked for clarification with regard to the charges being brought against him. (Tr. at 13). Agent Szabo explained that the Hobbs Act robbery charges were related to the robbery of armored cars. (Id.). Powell did not ask any further questions. See (id.). Agent Szabo did not recall whether he told Powell about the potential penalties associated with these charges. (Tr. at 19).

buccal swabbing of Powell. (Id.). Agent Szabo explained to Powell that a buccal swab, which collected a subject's DNA, was a mandatory part of the federal booking process. (Tr. at 14-15). After taking the first sample, Agent Szabo asked Powell if he would submit to a second swab, for which he needed Powell's consent as it would be used as evidence against Powell. (Id.). Powell refused to give his consent to the second sample. (Tr. at 15).[10]

## II. DISCUSSION

Powell seeks to suppress statements he made while in custody because he contends that they were not voluntary under the totality of the circumstances and were thus obtained in violation of his rights under the Fifth Amendment of the Constitution. See generally [Doc. 440]. Specifically, Powell contends that he did not validly waive his Miranda rights and that his subsequent statements were not voluntary because they "were made after [he] suffered tremendous stress" as he was

---

[10] APD Officer Kyle Kleinhenz ("Officer Kleinhenz") testified at the hearing that on May 4, 2005, Powell, who was using an alias, was a passenger in a vehicle he stopped for making an improper lane change. (Tr. at 21-22). During a subsequent search of the vehicle, Officer Kleinhenz found a trafficking amount of cocaine and a weapon. (Tr. at 22). During the encounter, Officer Kleinhenz spoke with Powell after advising him of his Miranda rights, reading them verbatim from the card APD officers are issued at the academy. (Tr. at 23); see also Miranda v. Arizona, 384 U.S. 436, 375 (1966). Powell indicated that he understood his rights, did not ask any questions about those rights, and agreed to speak to Officer Kleinhenz, coherently responding to the officer's questions. (Tr. at 24).

being interrogated just after being released from spending "months in Fulton County Jail." [Id. at 1].

The government contends that the totality of the circumstances show that Powell's waiver of rights was valid and his subsequent statements were voluntary, and therefore no violation of the Fifth Amendment occurred. See generally [Doc. 447]. In support of this position, the government points to the fact that Powell was familiar with the criminal justice system and Miranda rights, he "never identified any coercive conduct actually engaged in by law enforcement officers," and he "never exhibited any factors that would appear to make him susceptible to coercion or intimidation." [Id.].[11]

**A.    Standard**

The government bears the burden of proving by a preponderance of evidence that Powell validly waived his Miranda rights.[12] United States v. Chirinos, 112 F.3d

---

[11] It is undisputed that Powell was in custody at the time he made these statements, and that he was subjected to an "interrogation" by Agents Szabo and Fears after being advised of his Miranda rights. (Tr. at 5-7, 18). There is also no genuine question that Powell signed the waiver portion of the Warning and Waiver Form. (Tr. at 10 & Gov. Ex. 1). Thus, the issue is whether Powell knowingly and intelligently waived his Miranda rights and made voluntary statements to the authorities.

[12] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and

1089, 1102 (11th Cir. 1997); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). A defendant may waive his rights under Miranda if the waiver is made knowingly, intelligently, and voluntarily.  384 U.S. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  When considering

---

protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id. at 473-74.  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

whether a Miranda waiver was knowing and intelligent, "[n]o single factor is necessarily determinative . . . but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002). To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167.

Aside from the mandates of Miranda and a valid waiver, a court must also determine whether statements made by a defendant were voluntary in light of the totality of the circumstances. See United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth, 412 U.S. at 226; Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)). "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted). "Among the factors the Court must consider are the defendant's intelligence, the length of his detention,

8

the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Id. (citations omitted).

As with the voluntariness of the Miranda waiver, the focus of the voluntariness inquiry with respect to a defendant's statements is whether the defendant was coerced by the government into making the statement: "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421; see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345. "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" Patterson, 2007 WL 2331080, at *4 (quoting Connelly, 479 U.S. at 164); see also United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam).

**B.     Analysis**

   **1.    *Knowing and Intelligent Waiver of* Miranda *Rights***

Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the accused. Edwards, 451 U.S. at 482. Powell's conduct demonstrated that he understood his rights: when Agent Szabo explained the content of the rights

9

warning and waiver, Powell did not ask for clarification, stop the interview, request counsel, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver. (Tr. at 10-13). Indeed, Agent Szabo confirmed that Powell understood each right and that any statements he made could be used in any criminal proceedings brought against him. See (Tr. at 10-11 & Gov. Ex. 1). Moreover, the government presented additional evidence regarding Powell's background and experience demonstrating his familiarity with Miranda and his rights by showing both that he had been arrested on seven previous occasions, (Tr. at 16-17); see also United States v. Collins, 40 F.3d 95, 98 (5th Cir. 1994) (finding waiver valid in part because of defendant's familiarity with criminal justice system as a result of his extensive criminal history), and that he had previously been advised of his Miranda rights when questioned by police, (Tr. at 21-25); see also United States v. Robinson, 404 F.3d 850, 861 (4th Cir. 2005) (finding waiver valid because defendant was "conversant with his rights" as he had been given Miranda warnings on previous occasions). Accordingly, under the totality of the circumstances here, the Court finds that Powell knowingly and intelligently waived his Miranda rights.

### 2. *Voluntariness of* <u>Miranda</u> *Waiver and Subsequent Statements*

Powell has presented no evidence that he was coerced or threatened into waiving his rights. The evidence clearly establishes that Powell was read his <u>Miranda</u> rights and was also asked to read them himself and that he then waived those rights by signing a written waiver. (Tr. at 9-11 & Gov. Ex. 1). There is no evidence that Powell was harassed or coerced by Agents Szabo and Fears or any other law enforcement agent into taking this action. In fact, Agent Szabo described Powell as being "almost jovial" at the time he was arrested, and specifically noted his coherent and calm demeanor. (Tr. at 7, 9, 12-14, 20). The totality of these circumstances demonstrate that Powell voluntarily waived his <u>Miranda</u> rights.

In addition, all factors used to evaluate the totality of the circumstances surrounding Powell's subsequent statements point in the direction of voluntariness. Powell was only interrogated for approximately one hour, (Tr. at 13), which is a reasonable amount of time, <u>see</u> <u>Martin v. Wainwright</u>, 770 F.2d 918, 927 (11th Cir. 1985), <u>modified on other grounds</u>, 781 F.2d 185, (11th Cir. 1986) (no coercion in spite of five hours of interrogation). There is no evidence that the agents threatened Powell in any manner, made any promises or inducements to obtain a statement, or otherwise applied force to Powell during the interrogation, and even removed his handcuffs for the duration of the interview. (Tr. at 6, 8, 12-13, 18, 20). The agents

were dressed in plain clothes and never pointed or otherwise displayed a firearm. (Tr. at 5-7, 9). During the interrogation, Powell never showed a desire to end the questioning, never asked for counsel, and never indicated that he did not understand the questions he was being asked. (Tr. at 10, 12-13). He appeared coherent at all times, answered questions responsively, and was able to easily follow instructions. (Tr. at 8, 10, 12-14).

Powell's sole argument that his waiver of Miranda and the statements he made to law enforcement were involuntary is predicated on the fact that he was interrogated immediately after his release from Fulton County jail, where "[h]e had been isolated from his family and friends for months" and his physical condition had been "degraded by his long stay in jail." [Doc. 440 at 3]. Powell asserts that because he was "only twenty-four at the time of the interrogation" and had "minimal" education,[13] "[t]he hope of freedom, suddenly dashed, left him in a vulnerable mental state" such that he "agreed with whatever the agents asked, initialed where he was instructed and signed away his constitutional rights." [Id.]. However, Powell has not identified any coercive conduct actually engaged in by Agents Szabo or Fears. See Connelly, 479 U.S. at 170 (citation and internal marks omitted) (noting that coercion by the police, not mere "moral and psychological

---

[13] As the government points out, the record contains no evidence concerning Powell's alleged "minimal" education. See [Doc. 447 at 5 n.3].

12

pressures to confess emanating from sources other than official coercion," is a necessary predicate to establishing that a defendant was coerced and his will was overborne). Moreover, the fact that Powell exercised his right against self incrimination by refusing to give the agents a second DNA swab, see (Tr. at 14-15), is strong evidence that he both understood his rights and voluntarily chose when to exercise those rights and when to waive those rights by speaking to the agents. Considering the totality of the circumstances, there is no basis for concluding that either Powell's waiver of his Miranda rights or the subsequent statements he made to police were involuntary.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Powell's motion to suppress statements, [Doc. 387], be **DENIED**.

**IT IS SO RECOMMENDED**, this 6th day of September, 2012.

*/s/ Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

13